Joseph R. Saveri (State Bar No. 130064)
Kevin E. Rayhill (State Bar No. 267496)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery, Suite 625
San Francisco, CA 94111
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940
jsaveri@saverilawfirm.com
krayhill@saverilawfirm.com

Brian Douglas Penny
Mark S. Goldman
GOLDMAN SCARLATO KARON & PENNY, P.C.
101 East Lancaster Avenue, Suite 204
Wayne, Pennsylvania 19087
Telephone: (484) 342-0700
Facsimile: (484) 580-8747
penny@gskplaw.com
goldman@gskplaw.com

*Attorneys for Individual and Representative Plaintiff
Coastal Plumbing Supply Company, Inc.*

[Additional counsel listed on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| COASTAL PLUMBING SUPPLY COMPANY INC., on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AB&I FOUNDRY, TYLER PIPE COMPANY, MCWANE, INC., CHARLOTTE PIPE AND FOUNDRY COMPANY, and RANDOLPH HOLDING COMPANY,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Coastal Plumbing Supply Company, Inc., on behalf of itself and all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, brings this class action for damages and other relief pursuant to the federal antitrust laws and demands a trial by jury.

**INTRODUCTION**

1.      This proposed class action alleges that Defendants AB&I Foundry, Tyler Pipe Company and McWane, Inc. (collectively, "McWane"), and Defendants Charlotte Pipe and Foundry Company and Randolph Holding Company LLC (collectively, "Charlotte Pipe") engaged in a conspiracy to fix, raise, maintain, and/or stabilize the prices of Cast Iron Soil Pipe ("CISP") sold by Defendants in the United States directly to Plaintiff and other Class Members in violation of the federal antitrust laws. McWane and Charlotte Pipe are collectively referred to herein as "Defendants."

2.      This case alleges a conspiracy among all Defendants to fix, raise, maintain and stabilize prices for CISP that they sold directly to Plaintiff and other Class Members, which began at least as early as January 1, 2006, and continues through the present. Additionally, Plaintiff alleges that Charlotte Pipe's 2010 acquisition and liquidation of Star Pipe Products, Ltd.'s ("Star Pipe") CISP business, which resulted in substantially decreased competition in the market for CISP, was an illegal acquisition, undertaken to facilitate and ensure the success of the price-fixing conspiracy herein alleged. As a result of Defendants' unlawful conduct, Plaintiff and the other Class Members, as defined below, have paid artificially inflated prices for CISP and thus suffered injury of the type the federal antitrust laws are designed to prevent.

3.      Since at least 2006, Defendants and their predecessors have been the primary sellers and manufacturers of CISP in the United States. Together, McWane and Charlotte Pipe control over 90% of the market for CISP.

4.      The United States Federal Trade Commission ("FTC") launched an investigation into Charlotte Pipe's acquisition of Star Pipe's CISP business, resulting in the FTC filing an administrative complaint on April 2, 2013, against Charlotte Pipe. Subsequently, Charlotte Pipe entered into a Consent Agreement prohibiting it from engaging in certain anti-competitive

activities. In this Complaint, reference will be made to the FTC's "Analysis To Aid Public Comment" ("*Analysis*") concerning that consent decree.

5.     Defendants and their predecessors are the only significant sellers and manufacturers of CISP in the United States. Together, McWane and Charlotte Pipe control over 90% of the market for CISP.

6.     Defendants were able to effectuate this conspiracy in part through the Cast Iron Soil Pipe Institute ("CISPI"). Defendants are the only members of CISPI and therefore had numerous opportunities to communicate and collude at CISPI events and meetings. CISPI facilitated communications and information-sharing among Defendants about prices, customers, and other confidential, commercially-sensitive information. Defendants also participated in other industry association meetings that provided the means and opportunity to conspire. Following these conspiratorial discussions at trade association meetings, Defendants would announce identical price increases, typically in the autumn to become effective the following January.

7.     Defendants took steps to conceal their conspiracy, including falsely providing market-based reasons for their price increases to customers. These communications to customers and the public did not reveal Defendants' collusion as the true reason for the price increases.

8.     Due to the Defendants' conspiracy and actions to keep competitors out of the CISP market, prices for CISP have increased steadily since at least 2006, despite declining demand in the United States caused, in part, by the 2007-2009 recession.

9.     Defendants' conduct alleged herein has unlawfully and unreasonably restrained competition. As a result of Defendants' unlawful conduct, Plaintiff and the other Class Members have paid artificially inflated prices for CISP exceeding the amount they would have paid in a competitive market.

## JURISDICTION AND VENUE

10.     The claims set forth in this Complaint arise under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1,  and Section 7 of the Clayton Act, 15 U.S.C. § 18.  Plaintiff seeks treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

11. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15 and 28 U.S.C. §§ 1331 and 1337 in that this action arises under the federal antitrust laws.

12. This Court also has diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are members of the Class who are citizens of a different state than Defendants. The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and this is a class action in which the number of members of the proposed Class is not less than one hundred.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Defendants transact business or are found within this District and a substantial part of the events giving rise to the claims arose in this District.

**PARTIES**

14. Plaintiff Coastal Plumbing Supply Company, Inc. is a New York corporation with its principal place of business located in 480 Bay Street, Staten Island, New York 10304. Plaintiff purchased CISP directly from one or more of the Defendants between January 1, 2006 and the commencement of this action.

15. Defendant McWane, Inc. is a Delaware corporation with its principal place of business located at 1201 Vanderbilt Road, Birmingham, Alabama 35234.

16. Defendant AB&I Foundry ("AB&I") is a division of McWane, Inc., with its principal place of business located at 7825 San Leandro Street, Oakland, California 94621.

17. Defendant Tyler Pipe Company ("Tyler Pipe") is a division of McWane, Inc., with its principal place of business located at 11910 County Road 492, Tyler, Texas 75706.

18. Defendant Charlotte Pipe and Foundry Company is a North Carolina corporation with its principal place of business located at 2109 Randolph Road, Charlotte, North Carolina 28207.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

19.     Defendant Randolph Holding Company, LLC is a wholly-owned subsidiary of Charlotte Pipe and is a Delaware limited liability company with its principal place of business located at 2109 Randolph Road, Charlotte, North Carolina 28207.

## AGENTS AND CO-CONSPIRATORS

20.     The acts of Defendants alleged in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

21.     Various persons or firms not named as Defendants, including Star Pipe, have participated as co-conspirators in the violations alleged herein. In order to participate in the conduct charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of Defendants' antitrust violations and conspiracies.

22.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## INTERSTATE TRADE AND COMMERCE

23.     Throughout the Class Period (as defined below), Defendants manufactured, produced, sold, distributed, and/or shipped substantial quantities of CISP in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including within this District.

24.     Defendants' unlawful activities that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## RELEVANT MARKET

25.     The relevant product market for purposes of this Complaint is the market for the sale of CISP for use in commercial, industrial, and multi-story residential buildings in the United States.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

26.     The relevant geographic market for purposes of this Complaint is the United States.

## FACTUAL ALLEGATIONS

**Cast Iron Soil Pipe and Fittings**

27.     CISP is primarily used in buildings for sanitary and storm drain, waste, and vent piping applications. CISP is used in residential, commercial, and industrial construction.

28.     Manufacturers of CISP sell to companies that use CISP in construction projects or to independent wholesale distributors (like Plaintiff) or stocking houses for resale to end users. The end users of CISP are typically construction firms, mechanical engineering firms, plumbers, and developers.

29.     CISP is manufactured predominantly from cast iron.  Cast iron generally refers to a series of alloys primarily made of iron, carbon, and silicon.  Cast iron may also contain trace amounts of other materials such as manganese, sulfur, and phosphorous.

30.     According to the *Cast Iron Soil Pipe & Fittings Handbook ("Handbook")*,[1] CISP is manufactured in a foundry.  Casting of CISP is a highly mechanized process.  The modern CISP foundry consists of six major sections or departments: (1) radiation screening; (2) the storage yard for raw materials; (3) the melting area; (4) the molding and casting area where CISP is manufactured; (5) the cleaning department where the CISP is cleaned, coated and prepared for storage or shipment; and (6) the storage and shipping area for finished products.

31.     CISP has numerous characteristics that make it particularly well-suited for drain, waste, vent, and sewer plumbing applications. These include unique resistance to corrosion and abrasion.  Over 95 percent of the soils in the United States are non-corrosive to cast iron.   CISP is also highly resistant to abrasion from sand, gravel, glass particles, garbage disposal residue and other debris.  Numerous state and local building codes require the use of CISP for certain types of construction. The following picture, taken from Defendant Charlotte Pipe's website, provides an illustration of their CISP:

---

[1] 2006 edition of the *Cast Iron Soil Pipe & Fittings Handbook* ("*Handbook*"), disseminated by the Cast Iron Soil Pipe Institute ("CISPI"), available at http://www.cispi.org/CISPI/handbook/ (accessed October 22, 2013).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS



**The CISP Industry**

32.     As the *Handbook* states, CISP was first used in the United States at the beginning of the 19th century, when it was imported from England and Scotland to replace the wooden systems in use principally in the northeastern part of the country, with Bethlehem, Pennsylvania being among the first to replace a wooden system with CISP. In 1819, limited production began in New Jersey and New York.

33.     The manufacture of CISP emerged as a distinct industrial activity in the United States in the 1890's with 37 foundries devoted to soil pipe production existing in 13 states by 1898.

34.     According to the *Handbook*, by 1922, the nation's production of CISP had reached 357,000 net tons, with 50% of production emanating from Alabama. According to the U.S. Department of Commerce, an all-time high in tonnage shipped was reached in 1972. In recent years, the production of CISP has fluctuated with demand and periods of new construction.

35.     According to the *Handbook*, of the total CISP production, fifty-nine percent (59%) of the pipe produced is 3-inch and 4-inch in circumference, twenty-five percent (25%) is 1 1⁄2-inch and 2-inch, and sixteen percent (16%) is 5-inch and over.  It is estimated that fittings constitute approximately twenty two percent (22%) to twenty five percent (25%) of the total tonnage of CISP combined production.

36.     The industry requires efficient distribution networks and large inventories to provide ready availability of CISP products.  CISP is delivered to purchasers across the United States and nearly all of the industry's CISP is shipped directly from the manufacturer by truck.

**Defendants' CISP Businesses**

37.     AB&I began operations in the months following the San Francisco earthquake of 1906.  AB&I began CISP manufacturing to meet the demands of the housing boom of the late 1940's and early 1950's, and CISP has developed into its main product line.  The AB&I website touts AB&I as a major nationwide manufacturer of CISP and the "largest manufacturer of cast iron soil pipe and fittings in the Western United States."[2]

38.     Tyler Pipe was founded in 1935 as a manufacturer of cast iron pipe, fittings, couplings and gaskets, named after its home base of Tyler, Texas.  In addition to a foundry located in Tyler, Tyler Pipe operates or has operated manufacturing facilities in Marshfield, Missouri and distribution centers in Macungie, Pennsylvania, City of Industry, California and Oakland, California.

39.     Both AB&I and Tyler Pipe are divisions of McWane. McWane has been engaged in the cast iron pipe and fittings manufacturing business since 1904. McWane acquired Tyler Pipe in 1995 and AB&I in 2006.  In 2007, pursuant to a corporate reorganization, McWane consolidated its CISP business, putting all CISP operations together according to product lines.

40.     Charlotte Pipe was founded and began manufacturing and selling CISP in Charlotte, North Carolina in 1901.  Charlotte Pipe states that it produces Service, Extra Heavy, and No-Hub CISP for drain and vent applications and a complete line of double-hub pipe. Charlotte Pipe's cast iron foundry is "one of the largest and most modern facilities of its kind in the nation."[3]

**Market Characteristics Conducive to Collusion**

41.     Certain factors support the existence of a cartel.  These factors include a high degree of industry concentration, high barriers to entry, product interchangeability, and demand

---

[2] *See* http://www.abifoundry.com/history.htm (accessed October 24, 2013).
[3] *See* http://www.charlottepipe.com/Default.aspx?Page=Plants (accessed October 24, 2013).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

inelasticity. Publicly available data on the CISP industry supports the existence of a price-fixing cartel.

**High Degree of Industry Concentration**

42.    There are only three producers of CISP in the United States, Charlotte Pipe, AB&I, and Tyler Pipe. As noted above, both Tyler Pipe and AB&I are divisions of McWane, so the industry essentially functions as a duopoly.

43.    The FTC *Analysis* describes the industry as "highly concentrated" noting that McWane and Charlotte Pipe were selling "in excess of ninety percent of the CISP products in the United States." The FTC *Analysis* also indicated that the exit of Star Pipe from the market "substantially increased the level of concentration in the relevant market[]."

**High Barriers to Entry**

44.    The presence of high barriers to entry facilitates a collusive arrangement by excluding potential competitors. There are significant barriers to entry or expansion into the CISP market.

45.    First, there are substantial costs associated with building or acquiring a foundry, and with purchasing the specialty manufacturing tools necessary for the production of CISP.

46.    Second, a new entrant would have to develop relationships with both plumbing distributors and end-users and develop a network for the distribution of its CISP products.

47.    Finally, for a manufacturer to successfully enter the market it must be able to produce all variations of CISP and accompanying fittings, in order to offer a full line of CISP products to customers.

48.    The FTC *Analysis* noted that there was no likelihood of new entry that would deter the anticompetitive effects of Charlotte Pipe's acquisition of Star Pipe's CISP assets.

**Product Interchangeability**

49.    When products offered by different suppliers are viewed as interchangeable by the purchasers, it is easier to fix a single price for the product in question and it is easier to effectively monitor each other's prices to deter "cheating." Thus, when a product is viewed as a

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

"commodity," interchangeable with other products in the market, it is easier to form and sustain a cartel.

50.     Defendants' products are homogenous, as they are produced pursuant to industry-wide standards. Because all CISP is standardized and must meet strict American Society for Testing and Materials requirements, manufacturers of CISP compete mainly on price, with CISP produced at one foundry being a perfect substitute for CISP produced at another. This product homogeneity enhanced Defendants' ability to collude on prices and detect deviations from those fixed prices.

**Demand Inelasticity**

51.     Demand for CISP is relatively inelastic because, as noted in the *Handbook*, there is no functional substitute for CISP. As the FTC noted in its *Analysis*, plastic products, such as PVC or ABS pipe, are not viable substitutes for CISP for the reason that CISP has important properties that are not present in plastic pipe, including unique acoustical characteristics, performance durability and high crush strength, resistance to corrosion and abrasion, the ability to withstand extreme temperatures, and non-combustibility.  Tests of CISP for these properties reveal its superior characteristics as a material for drain, waste, vent, and sewer piping.

52.     CISP is known for its quiet operation.  It has acoustical characteristics more effective in reducing plumbing noise than other materials.

53.     Also, unlike other materials, cast iron has high crush strength suitable for under-foundation installation and exhibits resistance to abrasion from tree roots, penetration by rodents, and failure because of ground shifts.   Accordingly, unlike plastic pipe, no special bedding is required to support CISP.

54.     The thermal expansion and contraction of cast iron is far less than that of other pipe and fitting materials.  Also, CISP is noncombustible and will not burn in the event of a building fire, which is not the case with other piping materials.

55.     Additionally, many state and regional codes mandate the use of CISP, as opposed to other products such as plastic pipes and fittings.  As a result, there is no alternative to CISP in areas covered by such codes.

**Defendants Had Many Opportunities to Collude Through CISPI and Other Trade Associations**

56.     Defendants and their affiliated entities comprise the only members of the CISPI. At its formation in 1949, CISPI included 24 manufacturers. Today, the organization lists only AB&I Foundry, AB&I Service Center, Charlotte Pipe & Foundry, Tyler Coupling, Tyler Pipe and Tyler Pipe Service Center as its members.  These current members of CISPI are all either Defendants, or are entities owned and controlled by Defendants.

57.     As the only members of CISPI, Defendants have had numerous opportunities to discuss pricing at CISPI events.  Executives and managers from Defendants attend CISPI events together at least twice per year.

58.     Upon information and belief, CISPI is used by Defendants as a mechanism to facilitate communication and coordination of their activities, including price-fixing, maintaining their market shares, and excluding foreign competition.

59.     Further opportunities to discuss and implement the unlawful conspiracy alleged herein were provided through the annual meetings of the American Supply Association, which counts CISP manufacturers as participants.  Upon information and belief, in addition to their coordinated activities through CISPI, Defendants' executives also attended these annual American Supply Association meetings.

60.     Other trade associations, such as the American Water Works Association, held conferences and meetings, which provided additional opportunities for Defendants to meet to discuss and fix prices.

**The Defendants' Price-Fixing Conspiracy**

61.     As described above, Plaintiff alleges that Defendants, as the dominant suppliers in the market, have been involved in a conspiracy to fix the prices of CISP since at least 2006. Defendants' CISP list prices and rebates (which are made available on their respective websites or to customers) have been maintained in lockstep with each other during the course of the conspiracy.  Their multipliers (the percentages multiplied by a given list price to arrive at the respective transaction price) have similarly been maintained in lockstep with each other.

62.     Defendants often announced identical price increases very close in time to one another, and soon after a trade association meeting occurred.

63.     The prices posted by Defendants for the most common sizes of CISP are all effective the first of the year and mirror each other exactly.

64.     Due to the conspiracy, Defendants have been able to inflate prices to supra-competitive levels.  In fact, Defendants have steadily increased prices since January 1, 2006, despite the fact that construction spending, a prime determinant of CISP demand, has fallen significantly during that time.  Available statistics regarding CISP pricing show Defendants raised prices more than 50% between 2006 and 2013 while construction spending fell by nearly 40% between 2006 and 2011, only rebounding slightly by 2013.

65.     Price increases cannot also be attributed to changes in the cost of manufacturing CISP during this time period.  Price increases have significantly exceeded increases in production costs. The primary cost determinants for CISP—including scrap iron and natural gas—have increased at rates substantially less than the price increases set forth above.

**The Acquisition of Star Pipe's CISP Business Furthered the Conspiracy**

66.     In 2010, Charlotte Pipe acquired and liquidated the CISP assets of one of its chief rivals in the CISP market, Star Pipe, in furtherance of the conspiracy.

67.     Prior to 2007, Star Pipe had produced and sold, among other things, ductile iron pipe fittings products. In 2007, Star Pipe entered the CISP market.  Star Pipe's entry jeopardized Defendants' price-fixing scheme.

68.     Star Pipe's potential growth as a competitor posed a threat to Defendants' ability to maintain their ongoing price-fixing conspiracy.  In keeping with their efforts to exclude competitors through their control of CISPI, Defendants took actions to foreclose competition engendered by Star Pipe.  Specifically, in 2010, Charlotte Pipe commenced steps to eliminate Star Pipe as a competitor in the CISP market and to maintain Defendants' price-fixing conspiracy by acquiring Star Pipe's CISP assets.

69.     According to the FTC *Analysis*, Charlotte Pipe executed a confidential Asset Purchase Agreement with Star Pipe to purchase its CISP assets for approximately $19 million on

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

July 14, 2010.  This agreement allowed Charlotte Pipe to acquire the entirety of Star Pipe's CISP business including Star Pipe's CISP inventory, production equipment, business records and customer lists.

70.     Upon information and belief, several Star Pipe executives received large cash bonuses following the completion of the sale of the CISP business to Charlotte Pipe.  According to the FTC *Analysis*, Charlotte Pipe destroyed the CISP production equipment that it acquired from Star Pipe.

71.     The parties also signed a "Confidentiality and Non-Competition Agreement" that prohibited Star Pipe and certain Star Pipe employees from competing with Charlotte Pipe in the United States, Canada, and Mexico for a period of six years.  In addition, Star Pipe agreed to keep the acquisition confidential and to send a letter to its customers stating that it had decided to exit the CISP business.

72.     As noted in the FTC's Complaint, the Star Pipe acquisition was not the only CISP business that Charlotte Pipe had purchased from a competitor.  Charlotte Pipe acquired the CISP assets of several other potential competitors, including the Richmond Foundry in 2002, DWV Casting Company in 2004, and Matco-Norca in 2009. Charlotte Pipe developed a pattern of purchasing a company in order to shut down production and destroy any CISP assets when the company posed a risk of stimulating price competition in the CISP market.  The elimination of these competitors, like the activities coordinated through CISPI, has facilitated Defendants' ability to maintain and enforce their price-fixing conspiracy.

73.     In April of 2013, the FTC filed a Complaint challenging the acquisition. The FTC Complaint alleged that Charlotte Pipe had violated Section 7 of the Clayton Act, as amended (15 U.S.C. § 18), and Section 5 of the FTC Act, as amended (15 U.S.C. § 45).  The FTC issues such complaints when it has "reason to believe that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest."

74.     The FTC's Complaint deemed the effect of Charlotte Pipe's acquisition of Star Pipe's CISP business to "have been a substantial lessening of competition in the relevant markets,"  specifically finding the acquisition "eliminated actual, direct, and substantial

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

competition between Charlotte Pipe and Star Pipe in the relevant markets; eliminated a maverick firm; increased the ability of Charlotte Pipe unilaterally to exercise market power; and prevented Star Pipe and certain Star Pipe employees from re-entering the CISP market for a period of six years."

75.    Subsequently, the FTC entered into a consent agreement with Charlotte Pipe. The purpose of the consent agreement was to "address the anticompetitive effects resulting from Charlotte Pipe's 2010 acquisition of the cast iron soil pipe business of Star Pipe."

76.    The consent agreement required that Charlotte Pipe must notify the FTC before acquiring any additional entities engaged in the manufacture or sale of CISP products for a period of ten years.  The FTC deemed this provision "the appropriate mechanism to review all proposed acquisitions by Charlotte Pipe in the CISP market to guard against future anticompetitive transactions."  The consent agreement further mandated that Charlotte Pipe inform its customers and the public of the acquisitions of Star Pipe and its other CISP competitors because "Charlotte Pipe's acquisitions are not widely known in the CISP industry" and the order "serves to inform market participants about Charlotte Pipe's role in the exit of Star Pipe, Matco-Norca, DWV, and Richmond Foundry from the CISP industry."  The consent agreement also prohibited Charlotte Pipe from enforcing the non-compete and confidentiality clauses contained in the Star Pipe asset purchase agreement.

## **FRAUDULENT CONCEALMENT**

77.    Plaintiff had no knowledge of the conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until the FTC filed its Complaint.  Accordingly, Plaintiff and members of the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until on or about April 2, 2013, when the FTC's Complaint was filed.

78.    Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and secrecy employed by the defendants and their co-conspirators to avoid detection and affirmatively conceal such violations. The affirmative acts of Defendants alleged

herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

79. Because Defendants' alleged conspiracy was kept secret until April 2, 2013, Plaintiff and Class Members were unaware of Defendants' unlawful conduct alleged herein, and they could not have known before that time that they were paying supra-competitive prices for CISP throughout the United States during the Class Period.

80. Indeed, Defendants' conspiracy was inherently self-concealing. CISP is not exempt from antitrust regulation, and thus, before April 2, 2013, Plaintiff reasonably considered the industry to be operating within the law. None of the facts or information available to Plaintiff and members of the Class prior to April 2, 2013, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

81. Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' non-public meetings and communications with each other. Defendants are alleged to have engaged in a secret conspiracy that, by definition, did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix CISP prices.

82. In the context of the non-public nature surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.

83. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until on or about April 2, 2013, when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct concerning the CISP industry, was first publicly disseminated. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' CISP prices before April 2, 2013.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

84.     Although Defendants' price increase announcements during the Class Period, including those in the form of new price lists, sometimes did not contain justifications for price increases, the announcements and price lists nevertheless constituted implicit statements that price increases were legitimate and were the result of competitive market forces. Customers also were told that price increases were the result of increasing raw material costs. Such statements were false and misleading in that they were not the sole cause of price increases. The price lists never included the real reason for price increases, namely Defendants' secret conspiracy.

85.     Defendants' statements justifying their price increases throughout the Class Period were designed to create, and did create, the impression that these increases were based on competitive market forces. These statements were false and misleading, and constituted affirmative and overt acts of concealment of the conspiracy, because Defendants' price increases resulted from the affirmatively and fraudulently concealed conspiracy alleged herein. As a result of this misleading conduct, Defendants' customers, including Plaintiff and other Class Members, were conditioned by experience in dealing with Defendants in what they believed to be a competitive industry to expect price increases from time to time, and to believe that this was the result of normal market forces, rather than the product of an illegal conspiracy.

86.     Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning CISP which they affirmatively concealed through methods including but not limited to: (a) secret communications discussing customers and prices of CISP in the United States; (b) secret meetings at trade association events to discuss and fix prices; (c) price increase announcements based on false and/or misleading reasons, including cost increases; and (d) agreements among themselves not to discuss publicly or reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

87.     As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations as to the claims asserted by Plaintiff and the Class.

## CLASS ALLEGATIONS

88.     Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

All persons or entities that purchased cast iron soil pipes or cast iron soil pipe fittings in the United States directly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through the present (the "Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries, predecessors, and affiliates, any co-conspirators, federal and state governmental entities and instrumentalities of federal and state governments.

89.     The Class is so numerous that joinder of all members is impracticable. On information and belief, hundreds, if not thousands, of individuals and entities purchased CISP from the Defendants during the Class Period.

90.     Plaintiff's claims are typical of Class Members' claims because Plaintiff and all Class Members share the same injury, as they were all damaged by Defendants' actions, which caused them to pay artificially inflated prices for CISP.

91.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class Members.

92.     Plaintiff is represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

93.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

a.   Whether Defendants engaged in a conspiracy to raise, fix, stabilize, and maintain prices of CISP sold in the United States;

b.   Whether Defendants agreed to allocate customers;

c.   The duration and extent of the conspiracy;

d.   Whether each Defendant was a participant in any such conspiracy;

e.   Whether the actions of Defendants in so conspiring violated Sections 1 and 3 of the Sherman Act;

f.   Whether the conspiracy had the effect of artificially inflating the price of CISP sold in the United States during the Class Period;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS

g. Whether Charlotte Pipe's acquisition of Star Pipe's CISP assets substantially increased concentration or decreased competition in the market for CISP, or was undertaken as a method of ensuring the continuing success of the Defendants' price-fixing conspiracy by eliminating a competitor from the market;

h. Whether Defendants violated Section 7 of the Clayton Act through their acquisitions;

i. Whether the conduct of Defendants caused injury to Class Members;

j. The measure and amount of damages incurred by the Class; and

k. Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

94. Adjudicating the claims of the Class Members as a class action is superior to a multitude of individual actions, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual Class Members would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## **FIRST CLAIM FOR RELIEF**

### **Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

95. Plaintiff incorporates by reference the allegations of paragraphs 1 through 94 above.

96. Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3).

97. Beginning at least as early as January 1, 2006, and continuing through the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents and/or other representatives, entered into and participated in a continuing agreement,

1   understanding, and conspiracy in restraint of trade to artificially fix, raise, maintain, and stabilize

2   prices for CISP sold in the United States.

3       98.     Defendants engaged in anticompetitive activities, the purpose and effect of which

4   were to artificially raise, fix, maintain, or stabilize the price of CISP sold in the United States.

5   These activities included:

6           a.  participation in meetings, conversations, and communications to discuss the

7               price and pricing terms for the sale of CISP in the United States;

8           b.  agreeing during those meetings, conversations, and communications to charge

9               prices at specified levels, and to otherwise fix, raise, maintain, or stabilize

10              prices of CISP sold in the United States; and

11          c.  taking numerous steps, as set forth above, to implement and maintain the

12              conspiracy.

13      99.     Defendants and their co-conspirators engaged in the activities described above for

14  the purpose of effectuating the unlawful agreements described in this Complaint.

15      100.    The acts done by each Defendant as part of, and in furtherance of, their contract,

16  combination, or conspiracy were authorized, ordered, or done by their officers, agents,

17  employees, or representatives while actively engaged in the management of Defendants' affairs.

18      101.    Charlotte Pipe's acquisition of Star Pipe's CISP business resulted in decreased

19  market competition and increased concentration in the market for CISP.

20      102.    Throughout the Class Period, Plaintiff and the other Class Members purchased

21  CISP from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

22      103.    Defendants' conspiracy in restraint of trade had the following effects, among

23  others:

24          a.  Price competition in the CISP market has been restrained, suppressed

25              and/or eliminated in the United States;

26          b.  Prices for CISP sold by Defendants have been fixed, raised, maintained and

27              stabilized at artificially high, supra-competitive levels throughout the United

28              States; and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
                                                    ANTITRUST LAWS

1                     c.   Plaintiff and Class Members have been deprived of the benefits of free and

2                          open competition.

3          104.    As a result of Defendants' unlawful conspiracy, Plaintiff and other Class Members

4    have been injured in their business and property.  Plaintiff and other Class Members have been

5    harmed by being forced to pay higher prices for CISP than they otherwise would have paid in the

6    absence of Defendants' conspiracy. This injury is of the type the federal antitrust laws were

7    designed to prevent and flows from Defendants' unlawful conduct.

8          105.    Accordingly, Plaintiff and the Class seek damages, to be trebled pursuant to

9    federal antitrust law, and costs of suit, including attorneys' fees.

10                          **SECOND CLAIM FOR RELIEF:**

11                  **Illegal Merger Under Section 7 of the Clayton Act**

12         106.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 105 of this

13   Complaint.

14         107.    Charlotte Pipe's acquisition of Star Pipe violated Section 7 of the Clayton Act, 15

15   U.S.C. § 18, because it has substantially lessened competition and/or tended to create a monopoly

16   in the relevant market.

17         108.    The acquisition eliminated actual, direct, and substantial competition between

18   Charlotte Pipe and Star Pipe.

19         109.    The acquisition increased concentration in the market for CISP and increased

20   Defendants' ability to exert market power.

21         110.    The acquisition has caused, and will continue to cause, severe anticompetitive

22   effects in the relevant market, including price increases above competitive levels.

23                          **PRAYER FOR RELIEF**

24         111.    Wherefore, Plaintiff demands judgment against Defendants as follows:

25                     a.   Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of

26                          the Federal Rules of Civil Procedure on behalf of the Class as defined above;

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
                                              ANTITRUST LAWS

b. That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1 and 3);

c. That Charlotte Pipe's acquisition of Star Pipe was an unlawful merger in violation of Section 7 of the Clayton Act (15 U.S.C. § 18);

d. That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

e. That judgment be entered for Plaintiff and Class Members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law;

f. That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g. That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

h. For such other and further relief as is just and proper under the circumstances.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL
ANTITRUST LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: November 15, 2013

JOSEPH SAVERI LAW FIRM, INC.

By:      */s/ Joseph R. Saveri*
        Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Kevin E. Rayhill (State Bar No. 267496)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery, Suite 625
San Francisco, CA 94111
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940
jsaveri@saverilawfirm.com
krayhill@saverilawfirm.com

Brian Douglas Penny
Mark S. Goldman
GOLDMAN SCARLATO KARON & PENNY, P.C.
101 East Lancaster Avenue, Suite 204
Wayne, Pennsylvania 19087
Telephone: (484) 342-0700
Facsimile: (484) 580-8747
penny@gskplaw.com
goldman@gskplaw.com

John Zaremba
ZAREMBA BROWNELL & BROWN, PLLC
40 Wall Street
New York, NY 10005
Telephone: (212) 400-7224
jzaremba@zbblaw.com

*Attorneys for Individual and Representative Plaintiff*
*Coastal Plumbing Supply Company, Inc.*

- 22 -